**AMERICAN NATIONAL BANK OF MINNESOTA, Appellant,**

v.

**HOUSING AND REDEVELOPMENT AUTHORITY FOR the CITY OF BRAINERD, Respondent.**

No. A08–1814.

Court of Appeals of Minnesota.

Oct. 13, 2009.

Stephen F. Rufer, Chad R. Felstul, Pemberton, Sorlie, Rufer & Kershner, P.L.L.P., Fergus Falls, MN, for appellant.

Wallace G. Hilke, Christopher R. Smith, Lindquist & Vennum, P.L.L.P., Minneapolis, MN, for respondent.

Adam D. Chelseth, Fryberger, Buchanan, Smith & Frederick, P.A., St. Paul, MN, Eric S. Johnson, Fryberger, Buchanan, Smith & Frederick, P.A., Duluth, MN, for amicus curiae National Association of Housing and Redevelopment Officials, Minnesota Chapter.

Considered and decided by Toussaint, Chief Judge; Shumaker, Judge; and Hudson, Judge.

## OPINION

HUDSON, Judge.

Appellant challenges the district court's grant of summary judgment in favor of respondent on appellant's claim for a deficiency judgment after respondent defaulted on a revenue note purchased by appellant. We conclude that, under the terms of the parties' agreement and the governing statute, appellant is not entitled to a deficiency judgment because the sources of repayment are limited to those sources of payment or pledged security enumerated in the bond transcript. Accordingly, we affirm.

## FACTS

In October 2003, respondent Housing and Redevelopment Authority for the City of Brainerd (HRA) approved a housing program to acquire and develop 96 lots for single-family homes, known as the Brainerd Oaks Development. Brainerd Oaks also included two commercial lots and four parks. In 2005, hoping to advance development of Brainerd Oaks, the HRA decided to construct ten model homes. Construction of the homes was to be financed by a revenue bond. More particularly, the proceeds of a revenue bond were to be used to release ten lots in the development from an underlying mortgage, construct the ten model homes, and fund a $141,000 interest reserve.

In July 2005, appellant American National Bank of Minnesota (ANB) purchased the revenue bond in the amount of $2,159,200. The terms of the revenue bond were set forth in a series of integrated documents that comprised the "bond transcript." In total, the bond transcript consisted of 13 documents, which authorized, detailed, and confirmed the terms and issuance of the revenue note.

Under the terms of the bond's revenue note,[1] which was dated July 12, 2005, the HRA "acknowledge[d] itself to be indebted and ... promise[d] to pay" to ANB the $2,159,200 plus interest. Payment of principal and interest was to be made primarily from the proceeds of the sale of the ten model homes, which were to be constructed and financed with the proceeds from the revenue bond. The revenue note further stated that payment was secured by: (1) the proceeds of the sale of the ten model homes; (2) an interest reserve fund in the amount of $141,000, which was deposited with ANB for payment of interest payments due during the construction period; (3) a pledge by the HRA to place the proceeds from the sale of two commercial properties in trust to secure the principal and interest payments; and (4) a July 12, 2005 mortgage, which granted ANB a first-priority security interest in, and mortgage lien on, the ten properties on which the model homes were to be built and gave ANB the right to foreclose on the properties in the event of default.

The HRA used the funds from the bond's revenue note to develop the model homes in hopes of stimulating sales and advancing development of Brainerd Oaks. But the project did not perform as expected. Three of the ten homes sold in June and July 2007, and a total of $539,855.23 was transferred to ANB in accordance with the terms of the documents in the bond transcript. Accordingly, ANB released its interest in those properties and applied the money to the balance owed on the note.

The revenue note matured on July 12, 2007, but the HRA failed to fully repay ANB, which constituted an event of default. More than $1,900,000 in principal and interest was owed on the revenue note.

In February 2008, ANB began this action, seeking to foreclose its mortgage on the remaining lots and improvements and to obtain a deficiency judgment against the HRA for the difference between the proceeds from the requested foreclosure sale and the amount owed under the bond's revenue note. The HRA stipulated to the foreclosure and sale of the properties, but opposed ANB's request for a deficiency judgment. Accordingly, the HRA moved to dismiss, or alternatively for summary judgment, on the portion of ANB's complaint seeking a deficiency judgment. In response, ANB filed a cross-motion for summary judgment, seeking a money judgment and foreclosure decree against the HRA.

The district court granted ANB's motion for a decree of foreclosure. But the district court granted summary judgment in favor of the HRA on the portion of ANB's complaint seeking a deficiency judgment. ANB's appeal follows.

## ISSUE

Did the district court err in applying the plain language of the bond transcript or in

---

1. The terms "note" and "bond" are distinguishable, though they are similar and sometimes used interchangeably. Broadly speaking, "note" identifies a debt security with a short term or sold to a small number of qualified investors, while "bond" typically describes a debt security of a longer term that is offered to the general public. *Ala. Power Co. v. City of Scottsboro,* 238 Ala. 230, 190 So. 412, 417 (1939).

applying Minnesota law when it granted the HRA's motion for summary judgment on ANB's claim for a deficiency judgment?

## ANALYSIS

On review of a grant of summary judgment, we determine "whether there are any genuine issues of material fact and whether the district court erred in its application of the law." *City of Morris v. Sax Invs., Inc.,* 749 N.W.2d 1, 5 (Minn. 2008) (quotation omitted). We review questions of law, including the construction and effect of an unambiguous contract and the construction and applicability of a statute, de novo. *Denelsbeck v. Wells Fargo & Co.,* 666 N.W.2d 339, 346 (Minn.2003); *Merritt v. Mendel,* 690 N.W.2d 570, 572 (Minn.App.2005).

Broadly speaking, ANB contends that this appeal involves a typical commercial loan and promissory note, that the HRA defaulted on the note, and that it is therefore entitled to foreclose on the properties which secured payment on the note and to obtain a deficiency judgment against the HRA—a deficiency judgment that would effectively allow ANB to pursue other HRA assets in ANB's efforts to collect on the amount owed. The HRA does not dispute that the bond's revenue note is in default and that an amount remains due and owing. But the HRA contends that the bond's revenue note is a unique financing vehicle which limits a creditor's ability to pursue collateral to only that collateral identified in the bond transcript, and therefore ANB should not be allowed to obtain a deficiency judgment and perform an "end run" around the repayment terms of the revenue note.

The district court agreed with the HRA, explaining that the plain language of the bond transcript and operation of Minnesota statutes limited the repayment of the bond's revenue note to the sources expressly enumerated in the bond transcript, and that, as a result, ANB was not entitled to a deficiency judgment. Thus, the question on appeal is whether ANB may satisfy the amounts due and owing under the bond's revenue note from the HRA's general revenues or assets, or whether ANB's collection efforts are limited only to those HRA assets listed and pledged as security in the bond transcript.

### A. The bond's revenue note is not a typical promissory note.

We disagree with ANB's premise that this case involves a typical promissory note. First, the parties agree that this case involves a revenue bond. A revenue bond is a distinct type of obligation, and it is payable from a specific fund—often a fund consisting of proceeds earned by the facility that the bond financed. Osborne M. Reynolds, Jr., *Local Government Law* 323 (1982). A revenue bond is distinguishable from a general obligation bond, which is payable from the issuer's general revenues and backed by the "full faith and credit" of the issuer. *See id.; see also Lifteau v. Metro. Sports Facilities Comm'n,* 270 N.W.2d 749, 757 (Minn.1978) (observing distinction between revenue bonds and general obligation bonds). The parties further agree that the instrument in this case was issued under Minn.Stat. § 469.034, subd. 1, which authorizes the HRA to issue revenue bonds. Finally, the bond transcript itself indicates that this was not a typical commercial loan and promissory note. The documents in the bond transcript indicate that the HRA "issued" the revenue note, which was "purchased" by ANB (as opposed to ANB "lending" funds to the HRA). ANB is identified as the "registered owner" of the revenue note, not the lender. Additionally, in an investment letter from ANB, which is included in the bond transcript,

ANB stated that it would comply with federal securities law in the event of any resale of participating interests in the revenue note. Thus, the instrument issued by the HRA is a special type of security. ANB cannot divorce the revenue note from its underlying context. We, therefore, reject ANB's contention that its transaction with the HRA was nothing more than a typical, private, commercial loan and promissory note.

### B. The repayment sources identified in the bond transcript are the only security for repayment.

■ We now turn to the parties' written agreement, as reflected by the bond transcript. A contract and several writings relating to the same transaction must be construed with reference to each other. *Anderson v. Kammeier,* 262 N.W.2d 366, 370–71, n. 2 (Minn.1977); *see also S.O. Designs USA, Inc. v. Rollerblade, Inc.,* 620 N.W.2d 48, 54 (Minn.App.2000) (construing multiple settlement documents and releases as a single contract), *review denied* (Minn. Feb. 21, 2001); *Carlson v. Estes,* 458 N.W.2d 123, 127 (Minn.App.1990) (construing mortgage, note, and collateral agreement as single contract, explaining that the documents, which were executed at the same time and pertained to the same transaction, were to be considered together). Here, the 13 documents in the bond transcript were executed in connection with the July 12, 2005 closing and the issuance of the revenue note. The bond transcript constitutes an agreement to which both parties are bound, and we consider the transcript in its entirety.

■ Neither party argues that the documents in the bond transcript are ambiguous. "The construction and effect of an unambiguous contract present questions of law, which we review de novo." *Dorsey & Whitney LLP v. Grossman,* 749

N.W.2d 409, 417–18 (Minn.App.2008). "[T]he primary goal of contract interpretation is to determine and enforce the intent of the parties." *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.,* 666 N.W.2d 320, 323 (Minn.2003). When interpreting a written instrument, "the intent of the parties is determined from the plain language of the instrument itself." *Travertine Corp. v. Lexington–Silverwood,* 683 N.W.2d 267, 271 (Minn.2004). We will not rewrite, modify, or limit the effect of a contract provision by a strained construction when the contractual provision is clear and unambiguous. *Id.* A contract's terms are to be interpreted in the context of the entire contract and with meaning given to all of its provisions. *Edina Dev. Corp. v. Hurrle,* 670 N.W.2d 592, 596 (Minn.App. 2003) (citing *Brookfield Trade Ctr., Inc. v. County of Ramsey,* 584 N.W.2d 390, 394 (Minn.1998)), *review denied* (Minn. Dec. 23, 2003).

■ Here, the revenue note states that principal and interest on the revenue note "are *payable primarily* from revenues resulting from the sale of the ten (10) homes to be constructed with the proceeds of the note." (Emphasis added.) The revenue note goes on to state that:

> *Payment of principal and interest on the note will be secured by* (i) [the 2005 mortgage], made by [the HRA] in favor of [ANB], the original Purchaser of the Note; (ii) proceeds of the sales of the ten (10) homes to be constructed . . .; (iii) an interest reserve fund in the amount of $141,000 to be deposited with [ANB] for the payment of interest payments during the construction period; and (iv) a pledge from [the HRA] to place all net proceeds from the sale of two commercial proprieties within the Brainerd Oaks Development, when sold, in trust for the security of the Note.

(Emphasis added.) Other documents in the bond transcript, including one of the authorizing resolutions and the amended and restated housing-finance-program statement, similarly state that "payment of principal and interest due on the Note will be secured by" the same four sources listed in the revenue note.

Relying heavily on the "payable primarily" language in the revenue note, ANB argues that, in seeking to collect the monies due and owing, it is not limited to the finite list of items identified as a payment source or a pledged security in the revenue note and related documents. Further, ANB contends that there is a difference between "payment" and "security," and that because "payment" and "payment sources" connote a broader pool of potential assets, ANB is not limited in its collection efforts to the HRA assets listed as pledged security. We acknowledge the distinction between the two terms, but we must also acknowledge the distinction between a revenue bond and a general obligation bond.

■ The parties agree—and the bond transcript confirms—that the instrument issued was a revenue bond, not a general obligation bond. Revenue bonds, by definition, are payable from specific sources, not from the general assets of the issuer. *See* Minn.Stat. § 469.034, subd. 1. As such, the bond's revenue note here must be payable from a specific source. The bond transcript identifies that specific source: the proceeds from the sale of the ten homes. The proceeds from the sale of the homes are also pledged as security, as are the 2005 mortgage, the interest reserve fund, and a pledge of the proceeds from the two commercial properties. No other revenues or assets of the HRA are identified as a source of payment or pledged as security. "[T]he expression of specific things in a contract implies the exclusion of all not expressed." *Maher v. All Nation Ins. Co.*, 340 N.W.2d 675, 680 (Minn. App.1983), *review denied* (Minn. Apr. 25, 1984). Although the revenue note provides that the "[t]he interest payment or principal and interest payment so in default shall continue as an obligation hereof until the interest payment or principal payment in default shall have been fully paid," this language does not authorize ANB to reach beyond the agreed-upon sources of repayment to satisfy the amounts due and owing under the revenue note.

In fact, at the time of closing, ANB acknowledged that the sources of repayment were limited. An investment letter, which was signed by ANB's president, dated July 12, 2005, and included in the bond transcript, states:

We understand that the Note is *payable* as to principal and interest from the (i) the proceeds of the sales of ten (10) homes to be constructed and financed with the proceeds of the Note; (ii) an interest reserve fund in the amount of $141,000, to be deposited with [ANB] for the payment of interest payments due on the Note during the construction period; and (iii) a pledge from the [HRA] to place all net proceeds from the sale of two commercial properties within the Brainerd Oaks Development, when sold, in trust to secure the principal and interest payments on the Note. We also understand that [the 2005 mortgage] also secures the principal and interest payments due on the Note.

(Emphasis added.)

Similarly, the opinion of bond counsel, which is included in the bond transcript, states that the revenue note is not a general obligation bond and is "*secured by and payable from*" the proceeds of the home sales, the interest reserve fund, the proceeds from the two commercial lots, and

also secured by the 2005 mortgage. (Emphasis added.) ANB argues that the opinion of bond counsel should not be dispositive here. But even without considering the opinion of bond counsel, the terms of the revenue note and other documents in the bond transcript compel the same conclusion.

### C. Minn.Stat. § 469.034, subd. 1, which governs the issuance of this bond, provides that revenue bonds are payable from a specific source, as opposed to the general assets of the issuer.

Our reading of the bond transcript is further supported by the statutory framework under which the revenue bond and its note were issued. As noted above, the parties agree that the bond's revenue note was issued under Minn.Stat. § 469.034, subd. 1. The interpretation of a statute is a question of law subject to de novo review on appeal. *Meister v. W. Nat'l Mut. Ins. Co.*, 479 N.W.2d 372, 376 (Minn.1992). The primary object in statutory interpretation is to ascertain and effectuate the intention of the legislature. Minn.Stat. § 645.16 (2008). "When interpreting a statute, we first look to see whether the statute's language, on its face, is clear or ambiguous. A statute is only ambiguous when the language therein is subject to more than one reasonable interpretation." *Am. Family Ins. Group v. Schroedl*, 616 N.W.2d 273, 277 (Minn.2000) (citation and quotation omitted). If a statute is unambiguous, the court may engage in no further construction or interpretation but must apply its plain meaning. *State by Beaulieu v. RSJ, Inc.*, 552 N.W.2d 695, 701 (Minn.1996). "We are to read and construe a statute as a whole and must interpret each section in light of the surrounding sections to avoid conflicting interpretations." *Schroedl*, 616 N.W.2d at 277.

Minn.Stat. § 469.034, subd. 1, provides the framework under which an HRA may issue a revenue bond:

An authority may issue bonds for any of its corporate purposes. The bonds may be the type the authority determines, including bonds on which the principal and interest are payable exclusively from the income and revenues of the project financed with the proceeds of the bonds, or exclusively from the income and revenues of certain designated projects, whether or not they are financed in whole or in part with the proceeds of the bonds. The bonds may be additionally secured by (1) a pledge of any grant or contributions from the federal government or other source, (2) a pledge of any income or revenues of the authority from the project for which the proceeds of the bonds are to be used, or (3) a mortgage of any project or other property of the authority.

Minn.Stat. § 469.034, subd. 1.

ANB argues that Minn.Stat. § 469.034, subd. 1, places no restrictions or limitations on the type of bond issued or the repayment structure for those bonds. In support of its position, ANB contends that the use of the word "including" in the statute demonstrates that the listed examples are "illustrative," not limiting. *See Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 99–100, 62 S.Ct. 1, 4, 86 L.Ed. 65 (1941) (stating that "the term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle"). Even if we were to agree with ANB's characterization of the word "including," we disagree with ANB's claim that the statute places no restriction on the sources of repayment. For example, the language does not grant the HRA the power to issue a general obligation bond; general obli-

gation bonds are controlled by Minn.Stat. § 469.034, subd. 2 (2008), which does not apply here.

Contrary to ANB's contentions, Minn. Stat. § 469.034, subd. 1, clearly provides that a revenue bond be payable from some specifically identified source (whether it be the proceeds of the project financed by the bonds or the proceeds of another designated project). This is consistent with the nature of revenue bonds.[2]

Here, the parties agreed to a finite list of sources of payment and security on the revenue note. It is no coincidence that the chosen, enumerated sources of payment and security track the language of Minn. Stat. § 469.034, subd. 1.

### D. In this case, the foreclosure statute does not entitle ANB to a deficiency judgment.

█ Finally, ANB argues that it is entitled to a deficiency judgment because it brought a foreclosure action, as provided by the parties' agreement, and Minnesota's foreclosure statute allows deficiency judgments. Minn.Stat. § 582.30 (2008) governs deficiency judgments by mortgage holders. "A deficiency judgment is a personal judgment." *Winne v. Lahart*, 155 Minn. 307, 312, 193 N.W. 587, 589 (1923). "If a deficiency judgment is allowed under section 582.30, the balance of the judgment remaining unpaid may be executed and satisfied in the same manner as a personal judgment against the mortgagor." Minn. Stat. § 581.09 (2008).

Minn.Stat. § 582.30 provides a procedure for obtaining a deficiency judgment to which a lender is already entitled by virtue of an underlying agreement. But here the HRA contracted with ANB to issue a revenue note, and their agreement limited the sources of payment and security. *Cf. United Realty Trust v. Prop Dev. & Research Co.*, 269 N.W.2d 737, 741 n. 4 (Minn.1978) (indicating that a nonrecourse loan left no deficiency). ANB admits that the HRA did not pledge its general obligation or its full faith and credit to repay the revenue note. Furthermore, the HRA only exercised its statutory authority to issue a revenue bond, which, by definition, is not payable from the issuer's general revenues. Thus, the parties' agreement and the authorizing statute preclude the issuance of a deficiency judgment against the HRA. Allowing ANB to obtain a deficiency judgment here would create a general obligation enforceable against the HRA and run afoul of the parties' agreement by creating a further source of repayment for the revenue note and converting the revenue note to one of general obligation.

### E. Conclusion

Construing the bond transcript as a whole and viewing the parties' agreement against the statutory backdrop governing revenue bonds, we conclude that the sources of repayment on the revenue note are limited to the sources of payment and security identified in the bond transcript. ANB may not reach beyond these specifically enumerated sources to obtain repayment on the bond's revenue note. Therefore, the district court did not err by granting summary judgment in favor of the HRA.

### DECISION

ANB, as the registered owner and the purchaser of the bond's revenue note, can-

---

**2.** Regardless of whether Minn.Stat. § 469.034, subd. 1, can be read to *require* the parties to limit recovery to funds from specific sources of collateral, it unambiguously *per-* mits the parties to agree to limit recovery to specific sources. Here, that is precisely what the parties did.

not obtain a deficiency judgment against the HRA, despite the HRA's default. Under the terms of the parties' agreement and in accordance with Minn.Stat. § 469.034, subd. 1, ANB cannot pursue the general assets of the HRA, but rather, can only obtain repayment through the sources of payment and pledged security identified by the parties in the bond transcript.

**Affirmed.**